IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| VICTOR DALE,<br><br>    Plaintiff,<br><br>vs.<br><br>CITY OF OREGON, *et al.*,<br><br>    Defendants. | CASE NO. 3:21-CV-01181-DAC<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**ORDER GRANTING DEFENDANTS'<br>MOTIONS FOR SUMMARY JUDGMENT** |

### INTRODUCTION

Plaintiff Victor Dale brought this excessive-force action under 42 U.S.C. § 1983 against Defendants City of Oregon (City) and Officers Joel Turner and Logan Nitkiewicz of the Oregon Police Department (collectively, Officers). (ECF #1). Mr. Dale alleges the Officers used excessive force in arresting him when they fired multiple times into his car, striking him twice. (ECF #1 at PageID 6-7). Mr. Dale also asserts state-law tort claims against the Officers for negligence as well as assault and battery. (*Id.* at PageID 11). Mr. Dale also asserts a *Monell* claim against the City. (*Id.* at PageID 7). On November 16, 2022, the parties consented to my exercising jurisdiction pursuant to 28 U.S.C. § 636(c). (*See* ECF #15).

### BACKGROUND

On the night of June 13, 2020, Officer Turner responded to a 911 call for alleged domestic violence at an apartment complex in Oregon, Ohio. En route, Officer Turner was stopped by a witness who reported seeing a black male assault a white female. (ECF #29-1 at PageID 127). Much

1

of the pertinent events leading up to and including the shooting were recorded by the Officers' body-worn cameras.[1]

At the scene stood Mr. Dale (a black male) and a white female, the mother of his daughter. (*Id.*). They are standing outside an apartment building next to the parking lot where Mr. Dale's car was parked. (Turner BWC at 00:10). Officer Turner asks, "Are you the guys who's fighting?" (*Id.* at 00:19). He then separated the two to question them. (ECF #29-1 at PageID 128-29). Mr. Dale moves to the wall of the apartment building and leans a laundry basket against the wall. (Turner BWC at 00:29-00:38). As he separated Mr. Dale, Officer Turner noticed the odor of an alcoholic beverage on Mr. Dale's breath. (*Id.* at PageID 127-28).

Mr. Dale then picks up his laundry basket and walks from the apartment building towards his car. (Turner BWC at 01:10). Officer Turner says, "Mind just hanging tight for me real quick?" (*Id.*; *see also* ECF #29-1 at PageID 130). Mr. Dale's verbal response is unclear from the video (Turner BWC at 01:11-01:15), but he continues to the driver's-side front door of his car, just out of frame of Officer Turner's camera. (Turner BWC at 01:25; *see also* ECF #29-1 at PageID 143-44, 159).

Around this time, Officer Nitkiewicz, who had been responding with another officer to a different 911 call in a neighboring apartment building, arrives to check on Officer Turner.

---

[1] Defendants manually filed the body-worn camera footage on a flash drive. (*See* ECF #32). I refer to the footage from Officer Turner's body-worn camera, filed with the label 224j@202006132143410_1.mpg, as "Turner BWC" and the footage from Officer Nitkiewicz's body-worn camera, filed with the label 226l202006132143150_1.mpg, as "Nitkiewicz BWC." Mr. Dale has not objected to the filing of these recordings or their use as evidence at summary judgment. Where appropriate, I also include references to specific segments of the footage using time references from the length of the video (not the timestamp in the lower right corner of each video).

(Nitkiewicz BWC at 00:57-01:10; *see also* ECF #29-1 at PageID 130, 169). Officer Turner reports everything is fine and Officer Nitkiewicz crosses back across the courtyard to the neighboring apartment building. (Nitkiewicz BWC at 01:01-01:05; *see also* ECF #29-1 at PageID 169-70). By the time Officer Nitkiewicz returned, the other officer had determined the call the pair was investigating was a prank. (*Id.* at PageID 170). He then returns to assist Officer Turner. (Nitkiewicz BWC at 02:18).

Mr. Dale then opens the driver's-side rear door and places his laundry basket into the back seat. (Turner BWC at 01:43). While Mr. Dale loads his car, Officer Turner did not repeat his request or order him to stop or remain at the scene. (Turner BWC at 01:25-02:08; *see also* ECF #29-1 at PageID 153). Mr. Dale then closes the driver's-side rear door and gets into the driver's seat of his car. (Turner BWC at 02:07). Around the same time, Officer Nitkiewicz returned to Officer Turner. (*Id.* at 02:05).

At that point, Officer Turner calls out to Mr. Dale, "Sir! Hey!" (Turner BWC at 02:08; Nitkiewicz BWC at 02:38). Officer Turner tries the doorhandle, but it is locked. (Turner BWC at 02:10). (*Id.*). The car engine turns over and starts. (*Id.* at 02:12). The headlights activate. (*Id.*). Officer Turner steps in front of the vehicle, points at Mr. Dale, and shouts "we're not doing that!" (*Id.* at 02:14; Nitkiewicz BWC at 02:40). Officer Turner sees the gearshift shift the car from "park" to "drive." (ECF #29-1 at PageID 138). Mr. Dale's hands go onto the steering wheel. (*Id.*). Officer Turner draws his service weapon. (*Id.*; Nitkiewicz BWC at 02:40). Mr. Dale accelerates the car. (Turner BWC at 02:15). Officer Turner shouts, "Stop! Stop! Stop!" (Nitkiewicz BWC at 02:42). The car hits Officer Turner's leg and he is sent over the hood. (*Id.*; *see also* ECF #29-1 at PageID 138). In that instant, Officer Turner fires two shots that hit Mr. Dale in the neck and shoulder. (*Id.*

3

at Page ID 138, 171-72). Mr. Dale's car continues through the parking lot and down the road. (Turner BWC at 02:19). Officer Nitkiewicz and Officer Turner both fire multiple shots into Mr. Dale's car. (*Id.* at 02:19-02:21; Nitkiewicz BWC at 02:43-02:47). The incident totaled fourteen seconds from when Mr. Dale closed the driver's door to when the Officers ceased firing. (Turner BWC at 02:07-02:21).

Officers Turner and Nitkiewicz pursue Mr. Dale (still in his car) on foot through the apartment complex's streets. (ECF #29 at PageID 171; Turner BWC 02:22-03:05; Nitkiewicz BWC 02:49-3:30). Officer Nitkiewicz's body-worn camera captured a radio call "he tried to run over 224!" (Nitkiewicz BWC at 02:49-02:51). Mr. Dale eventually stops at the gate of the complex. (Turner BWC at 03:05; Nitkiewicz BWC at 03:30). Officers Turner and Nitkiewicz order him out of the car. (*Id.*). Mr. Dale opens the driver's door and slumps onto the pavement, wounded and bleeding. (Turner BWC at 3:07-03:10). Officer Turner handcuffs Mr. Dale and the Officers perform first aid on him until an ambulance arrives. (Turner BWC at 03:25-03:41; *see also* ECF #29-1 at PageID 172).

Mr. Dale was indicted by a Lucas County grand jury for felonious assault and assault. (ECF #38-1 at PageID 469, 473). I take judicial notice that Mr. Dale was tried by a jury and acquitted on both charges. *See State v. Dale*, No. CR2021-1675, Lucas County Court of Common Pleas (Oct. 12, 2022) (docket sheet), http://co.lucas.oh.us/99/Dockets-Online.[2] He then filed suit in this court, bringing the claims described earlier. Officers Turner and Nitkiewicz jointly moved for summary judgment in their favor on the claims against them. (*See* ECF #30). The City separately moved for

---

[2] A federal court may take judicial notice of a state court's docket because it is a court record and is available online to members of the public. *See Lynch v. Leis*, 382 F.3d 642, 647 n.5 (6th Cir. 2004).

summary judgment in its favor on Mr. Dale's claim against it. (*See* ECF #31). Mr. Dale responded to the Officers' joint motion for summary judgment but did not respond to the City's motion. (*See* ECF #36).

## LAW AND ANALYSIS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that can affect the outcome of the case, and a dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Notably, the moving party carries the burden of showing there is no genuine issue of material fact, but the nonmoving party is not relieved of its burden of producing evidence that would support a jury verdict. *Id.* at 256. Likewise, "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of the pleading but must set forth specific facts showing that there is a genuine issue for trial." *Id.*; *see also* Fed. R. Civ. P. (56)(e).

To survive a properly supported motion for summary judgment, a nonmovant must present affirmative evidence from which a jury might return a verdict in its favor. *Anderson*, 477 U.S. at 257. If so, there is a genuine issue of material fact that requires a trial. *Id.* At this juncture, I must decide whether the evidence presents a sufficient disagreement that requires a trial or whether it is so one-sided that one party must prevail as a matter of law. *Massey v. Exxon Corp.*, 942 F.2d 340, 342 (6th Cir. 1991).

With these essential principles in mind, I turn to the defendants' various arguments seeking summary judgment.

I. **The Officers are entitled to summary judgment in their favor because both are accorded qualified immunity.**

Mr. Dale's first claim for relief asserts a § 1983 excessive-force claim against the Officers. His third and fourth claims against the Officers are state-law causes of action for negligence and assault and battery. The Officers jointly seek summary judgment in their favor on all three claims, arguing they are entitled to qualified immunity and statutory immunity.

Once the qualified-immunity defense is raised, "the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016). Where, as here, the defense is raised in a motion for summary judgment, courts must weave the summary judgment standard into each step of the qualified immunity analysis. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Lemmon v. City of Akron, Ohio*, 768 F.App'x 410, 414 (6th Cir. 2019).

A. **The § 1983 excessive-force claim**

Mr. Dale's first claim is brought under § 1983, which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. To establish liability under § 1983, Mr. Dale must show he was (1) deprived of a right secured by the United States Constitution or the laws of the United States and (2) subjected or caused to be subjected to the constitutional deprivation by a person acting under color of state law. *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994) (citing *Flagg Bros. v. Brooks*, 436 U.S. 149, 155 (1978)).

6

### 1. Qualified immunity and excessive force

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 320-21 (6th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Courts apply a "two-tiered inquiry to determine whether a defendant is entitled to qualified immunity." *Id.* at 321. Summary judgment is inappropriate if a court finds that (1) there are genuine issues of material fact as to whether officers violated the plaintiff's constitutional rights in an objectively unreasonable way, and (2) those rights were clearly established at the time such that a reasonable officer would have known that his conduct violated them. *Id.*

At the summary-judgment stage, I construe the evidence and draw all reasonable inferences in Mr. Dale's favor as the non-moving party; at the same time, because this case implicates qualified immunity, I only consider "the facts that were knowable to the defendant officers." *Reich v. City of Elizabethtown, Ky.*, 945 F.3d 968, 979 (6th Cir. 2019) (quoting *White v. Pauly*, 580 U.S. 73, 76-77 (2017)). Additionally, because the incident in question was recorded on body-worn camera footage, I must view facts shown on video "in the light depicted by the videos" but if "the facts shown on video 'can be interpreted in multiple ways or if [the] videos do not show all relevant facts,' [I] view those facts in the light most favorable to the non-moving party." *Gordon v. Bierenga*, 20 F.4th 1077, 1079 (6th Cir. 2021) (quoting *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017)).

The first step in the qualified-immunity analysis is to determine, based on the facts Mr. Dale advances, whether a constitutional violation has occurred. Because it is axiomatic that individuals have a clearly established right not to be shot absent "probable cause to believe that

[they] pose[] a threat of serious physical harm, either to the officer or to others," I must determine whether, in light of the facts and circumstances of this case, the Officers' respective uses of force violated Mr. Dale's Fourth Amendment right to be free from excessive force. *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Sample v. Bailey*, 409 F.3d 689, 698 (6th Cir. 2005)) (cleaned up).

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (cleaned up). "Police officers routinely face 'tense, uncertain, and rapidly evolving' situations that force split-second judgments about the degree of force required"; courts thus must account for that by "evaluat[ing] the force used through the eyes of a reasonable officer at the scene, not with 'the 20/20 vision of hindsight.'" *Reich*, 945 F.3d at 978 (quoting *Graham*, 490 U.S. at 396-97).

This objective test requires courts to assess the use of force from the perspective of a reasonable officer on the scene, "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. And courts must apply a segmented approach to the analysis by evaluating the "split-second judgments made immediately before the officer used allegedly excessive force." *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007) (quotation omitted). Discarded from this analytical overlay, then, is any "poor planning or bad tactics that might have created the circumstances that led to the use of force." *Reich*, 945 F.3d at 978 (cleaned up). Additionally, "[t]he Fourth Amendment only requires officers

8

to act reasonably on the information they have; it does not require them to perceive a situation accurately." *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017).

Although the reasonableness of the use of force must be based on the totality of the circumstances, the Sixth Circuit has "repeatedly found three factors to be helpful in excessive-force cases: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Lemmon*, 768 F.App'x at 414. These factors too are analyzed at the moment of the use of force. *See id.* at 415-16. The second *Graham* factor complements the Supreme Court's "probable cause" standard laid out in *Tennessee v. Gardner*, 471 U.S. 1 (1985), where an officer acts reasonably when using deadly force if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* at 11.

Because Mr. Dale brings excessive-force claims against both Officers, "[e]ach defendant's liability must be assessed individually based on his own actions." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). I look to whether each officer's use of force was unlawful or unconstitutional "based upon the 'information possessed' by the police officer involved." *Boyd v. Baeppler*, 215 F.3d 594, 600 (6th Cir. 2000) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Thus, I must analyze each officer's use of force individually, based on their own actions.

Additionally, I must examine excessive-force claims in segments. *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996). The use of force by the Officers can be broken into two segments: the two initial shots from Officer Turner that struck Mr. Dale through the windshield (ECF #29-2 at PageID 203-04; ECF #30 at PageID 401; ECF #36 at PageID 440), and the

subsequent shots fired by both Officers that impacted other parts of Mr. Dale's car as he drove away. (ECF #29-2 at PageID 205; ECF #30 at PageID 401; ECF #36 at PageID 440).

### 2. The two initial shots from Officer Turner that struck Mr. Dale through the windshield

As explained below, considering the Sixth Circuit's three-factor inquiry, I conclude Officer Turner's initial use of force was objectively reasonable under the totality of the circumstances.

#### a. The severity of the crime at issue

The first *Graham* factor—the severity of the crime at issue—militates in favor of finding the use of force to be objectively reasonable. The parties dispute whether the underlying offense was felonious assault on Officer Turner. (*Compare* ECF #30 at PageID 408 *and* ECF #37 at PageID 451-54, *with* ECF #36 at PageID 442). But as described above, I must assess the situation from the perspective of a reasonable officer on the scene at the moment force was used. *See Graham*, 490 U.S. at 396. The undisputed record demonstrates that at that time, Officer Turner was struck by Mr. Dale's car (even though Mr. Dale was later found not guilty of assaulting Officer Turner). (*See* ECF #29-1 at PageID 119, 131; *see also* ECF #30-1 at PageID 413; ECF #30-2 at PageID 415).

Despite the subsequent jury acquittal, the information Officer Turner had at the precise moment he used force was that he had been struck by Mr. Dale's car and thus Mr. Dale, the only occupant and drive of the car, had likely committed a felonious assault on a police officer. "The Fourth Amendment only requires officers to act reasonably on the information they have; it does not require them to perceive a situation accurately." *Thomas*, 854 F.3d at 365. Officer Turner was thus entitled to take this possible violent felony into consideration when making his subsequent decision to use deadly force. *See Stahl v. Coshocton Cnty., Ohio*, No. 2:15-CV-572, 2017 WL 6508384, at *9 (S.D. Ohio Sept. 22, 2017), *aff'd*, 754 F.App'x 335 (6th Cir. 2018). Because a

10

felonious assault on a police officer was the crime at issue, the first *Graham* factor militates towards deadly force being objectively reasonable. *See id.* at *9 (citing Ohio Rev. Code §§ 2903.13 and 2903.11(A)(2)).

Mr. Dale does not contest that his car struck Officer Turner but instead argues that because he did not seek out or intend to hit Officer Turner and was acquitted of felonious assault, it could not be the crime at issue. (ECF #26 at PageID 442). Again, however, I must view the situation from the perspective of a reasonable officer in Officer Turner's situation and without the "20/20 vision of hindsight." *See Graham*, 490 U.S. at 396. Mr. Dale's argument requires not only that I only consider Mr. Dale's subjective intent—when the appropriate inquiry is confined solely on the officer—but also view the situation in light of Mr. Dale's ultimate acquittal even though reliance on hindsight is inappropriate in this context. *See Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("[t]hat [plaintiff] may not have *intended* to injure [the police officer] or anyone else is immaterial.").

Mr. Dale also argues the Officers created the circumstances that led to the use of force: there was no evidence substantiating the 911 call for domestic violence, Officer Turner did not issue clear commands for Mr. Dale to stay but instead asked vaguely, the situation became hostile when the officers drew their weapons, Officer Turner purposely placed himself in harm's way, and the Officers terrified Mr. Dale into driving away. (*See* ECF #30 at PageID 443-44). The Sixth Circuit has long rejected arguments that leave the "split-second judgment made immediately before" the use of force in question and instead focus on "poor planning or bad tactics that might have created the circumstances that led to the use of force." *See Reich*, 945 F.3d at 978 (quoting *Livermore*, 476 F.3d at 407); *see also Dickerson*, 101 F.3d at 1161 (holding courts must examine

11

"whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances.") Thus, I must reject Mr. Dale's bad-tactics arguments that Officer Turner failed to give proper commands and put himself in front of Mr. Dale's car.

### b. Whether the suspect poses an immediate threat to the safety of the officer or others

The second *Graham* factor—whether the suspect poses an immediate threat to the safety of the officers or others—is of particular focus to this case where Officer Turner was injured by Mr. Dale's vehicle. The threat factor is "a minimum requirement for the use of deadly force," meaning deadly force "may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm." *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005).

The Sixth Circuit has held a police officer may "shoot at a driver that appears to pose an immediate threat to the officer's safety or the safety of others—for example, a driver who objectively appears ready to drive into an officer or bystander with his car." *Hermiz v. City of Southfield*, 484 F.App'x 13, 16 (6th Cir. 2012) (citing *Brosseau v. Haugen*, 543 U.S. 194, 197-200 (2004)). But a police officer may not continue to fire his weapon at a driver once the car moves away, leaving the police officer and bystanders in a position of safety, unless the police officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car. *Id.*

Mr. Dale's response focuses on whether he could be considered a threat to bystanders based on a suspicion he drank alcohol prior to getting in his car. (ECF #36 at PageID 442-43). The record demonstrates the most information Officer Turner could have had at the time of the use of force was the odor of an alcoholic beverage on Mr. Dale's breath. (*Id.*). A blood test conducted after Mr. Dale's arrest cannot be considered here because, as mentioned previously, courts may not

12

view the situation with the "20/20 vision of hindsight." *See Graham*, 490 U.S. at 396. But whether Mr. Dale was intoxicated or sober when he struck Officer Turner with his car does not decide whether he posed a danger to Officer Turner and thus is not germane to whether summary judgment is warranted. *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Intoxicated or not, Mr. Dale posed a threat to Officer Turner.

The body-worn camera videos conclusively establish that the shooting unfolded in a mere fourteen seconds, without the benefit of calm reflection or studious assessment. (Turner BWC at 02:07-02:21). The record, including the body-worn camera footage, demonstrates that shortly before Officers Turner first opened fire, he asked Mr. Dale to "hang tight" twice. (ECF #29-1 at PageID 153). Then, when Mr. Dale got into his car, Officer Turner stepped in front of Mr. Dale's car to block him from leaving. (Turner BWC at 02:10-02:14; *see also* ECF #29-1 at PageID 122, 130-31). Officer Turner shouted further commands to stop. (Turner BWC at 02:14). Then, Mr. Dale accelerated, striking Officer Turner. (*Id.*). Officer Turner was thrown on the hood of Mr. Dale's car. (ECF #29-1 at PageID 138).

As discussed above, in that instant, Officer Turner had probable cause to believe Mr. Dale committed a felonious assault on him. Thus, Mr. Dale posed an immediate threat to Officer Turner's safety and more than "objectively appeared ready to drive his car into an officer"—in fact, he had done just that. *See Hermiz*, 484 F.App'x at 16. The threat to Officer Turner from Mr. Dale establishes the second *Graham* factor and thus indicates the use of force to stop that threat was objectively reasonable. *See Beaudoin v. City of Dearborn Heights*, 876 F.2d 103 (6th Cir. 1989) (table).

### c. Whether the suspect fled or resisted arrest

The third *Graham* factor—whether Mr. Dale fled or resisted arrest—also militates towards the use of force being objectively reasonable. There is no dispute that Mr. Dale was driving away from Officer Turner and struck him while doing so. (ECF #36 at PageID 444) ("As [Mr. Dale] attempted to take off, his vehicle struck Officer Turner, because Turner put himself in the way of the vehicle."). Based on the information available to Officer Turner when he fired his first shots, he knew he had just been hit by Mr. Dale's car. (ECF #29-1 at PageID 138; *see also* Turner BWC at 02:14-02:21). A reasonable officer in Officer Turner's position in the moment of time that force was used could only conclude Mr. Dale was attempting to escape.

Mr. Dale argues he never evaded arrest or detention because he was never ordered to stay. (ECF #36 at PageID 443). Once again, this argument requires me to leave Officer Turner's perspective and view the situation from Mr. Dale's perspective and consider his subjective intent. I cannot do this; my inquiry is limited to the police officer's perspective. *See Graham*, 490 U.S. at 396. From that perspective, the officer had just been struck by a car and saw the driver attempting to flee the scene. In such a situation, the third *Graham* factor suggests that deadly force is objectively reasonable to prevent Mr. Dale's escape. *See Beaudoin*, 876 F.2d 103 at *2 (table).

### d. The totality of the circumstances around the first use of force

In sum, the totality of the circumstances demonstrate Officer Turner's first two shots were objectively reasonable in the face of a rapidly evolving situation that suddenly turned violent without any apparent provocation. After reviewing the record in the light most favorable to Mr. Dale, except where facts established by the body-worn camera footage, the undisputed facts demonstrate that all three *Graham* factors weigh towards deadly force being reasonable: (1) Officer Turner used force in response to a perceived felonious assault on himself; (2) Mr. Dale was a threat

to Officer Turner's safety, having struck him with his car; and (3) Mr. Dale sought to flee the scene. *See Graham*, 490 U.S. at 396. Moreover, the circumstances demonstrate Officer Turner had probable cause to believe Mr. Dale posed a threat of serious physical harm to him. *See Garner*, 471 U.S. at 11. Thus, Officer Turner's use of deadly force by firing the first few shots was objectively reasonable in light of the totality of the circumstances confronting him on the night in question.

### 3. The multiple shots Officer Turner fired in the second segment

The second segment of Officer Turner's use of force is the remaining shots he fired into Mr. Dale's car after Officer Turner was struck by Mr. Dale's car. The parties do not dispute that the first two bullets struck Mr. Dale and the remaining shots impacted other parts of his car. (*See* ECF #29-2 at PageID 203-05; *compare* ECF #30 at PageID 401, *with* ECF #36 at PageID 440).

A police officer shooting at a fleeing suspect and missing is not a "seizure" for purposes of the Fourth Amendment sufficient to support a claim under § 1983. *Adams v. City of Auburn Hills*, 336 F.3d 515, 519 (6th Cir. 2003) (quoting *Cameron v. City of Pontiac, Mich.*, 813 F.2d 782, 784 (6th Cir. 1987)); *see also Moore v. City of Cleveland*, No. 1:03-cv-01258, 2006 WL 2947052, at *2 (N.D. Ohio Oct. 16, 2006) ("[U]nder Sixth Circuit law, shooting at a fleeing felon, but missing, is not a seizure sufficient to support a claim under 42 U.S.C. § 1983.") (quotation omitted); *Lopez v. City of Cleveland*, No. 1:13-cv-1930, 2016 WL 6587463, at *4 (N.D. Ohio Apr. 18, 2016).

In this second segment, Officer Turner's firing at Mr. Dale's car as it fled did not impair Mr. Dale's movement. The parties do not dispute these shots did not strike Mr. Dale and there is no evidence in the record indicating he was struck by them. (*See* ECF #30-1 at PageID 413, ECF #30-2 at PageID 415; *compare* ECF #30 at PageID 401, *with* ECF #36 at PageID 440). The record demonstrates the shots that struck the car did not render it inoperable because Mr. Dale

15

was initially able to continue driving his car from the point of initial encounter. (Turner BWC at 02:18-02:22). The record indicates that at most, the car's body and odometer were damaged. (ECF #29-2 at PageID 203-05). Because the parties agree that Mr. Dale was not struck by Officer Turner's shots fired in the second segment, this use of force cannot be a "seizure" within the meaning of the Fourth Amendment and consequently, there can be no underlying constitutional violation. *See Adams*, 336 F.3d at 519-20. Without a constitutional violation, the shots Officer Turner fired in the second segment are not actionable under § 1983.

Because Officer Turner's first shots were an objectively reasonable use of force and his subsequent shots were not a seizure within the meaning of the Fourth Amendment, Officer Turner is entitled to qualified immunity from Mr. Dale's first claim for relief.

### 4. The multiple shots Officer Nitkiewicz fired in the second segment

The shots Officer Nitkiewicz fired are not actionable under § 1983 for the same reason the shots Officer Turner fired in the second segment are not actionable. Officer Nitkiewicz fired on Mr. Dale's vehicle at the same time Mr. Dale's car struck Officer Turner. (Nitkiewicz BWC at 02:43-02:47; Turner BWC at 02:19-02:21; *see also* ECF #29-1 at PageID 171). The parties do not dispute Officer Nitkiewicz's shots did not strike Mr. Dale and there is no evidence in the record indicating he was struck by them. (*See* ECF #30-1 at PageID 413, ECF #30-2 at PageID 415; *compare* ECF #30 at PageID 401, *with* ECF #36 at PageID 440). Officer Nitkiewicz's shots did not render it inoperable because Mr. Dale was initially able to continue driving his car from the point of initial encounter. (Nitkiewicz BWC at 02:47-02:49; *see also* ECF #29-1 at PageID 171). Because Mr. Dale was not struck by Officer Nitkiewicz's shots, this use of force was not a "seizure" within the meaning of the Fourth Amendment and consequently, there is no underlying constitutional

16

violation. *See Adams*, 336 F.3d at 519-20. Without a constitutional violation, the shots fired by Officer Nitkiewicz are not actionable under § 1983. Thus, Officer Nitkiewicz is entitled to qualified immunity from Mr. Dale's first claim for relief.

### B. State-law claims

Mr. Dale's third and fourth claims assert state-law actions for negligence and assault and battery. The Officers seek summary judgment and argue (1) Ohio law immunizes them by statute from negligence liability and (2) because their use of force was objectively reasonable, they did not act with the required tortious mental state to be liable for assault and battery. (ECF #30 at PageID 410-11).

Ohio law immunizes employees of political subdivisions from state-law tort claims, provided the acts and omissions in question were not "manifestly outside the scope of the employee's employment or official responsibilities" or were taken "with malicious purpose, in bad faith, or in a wanton or reckless manner[.]" Ohio Rev. Code § 2744.03(A)(6)(b). When federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the same questions of material fact, a court reviews the state-law immunity defense "through the lens of the federal qualified immunity analysis." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009). In those situations, a police officer's state-law-immunity defense "stands or falls with their federal qualified-immunity defense." *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018).

For the Officers to be entitled to statutory immunity, their actions must not be taken "with malicious purpose, in bad faith, or in a wanton or reckless manner." In this context, "malice" means the "willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified." *Otero v. Wood*, 316 F.Supp.2d 612, 629 (S.D. Ohio 2004) (citations omitted). "Bad faith" refers to a "dishonest purpose, conscious wrongdoing, or breach of

17

a known duty through some ulterior motive." *Id.* "Wanton misconduct" is defined as "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012). "Reckless conduct" is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.*

Applying these standards, I conclude that for the same reasons the Officers' actions were "objectively reasonable" entitling them qualified immunity, their actions were not taken "with malicious purpose, in bad faith, or in a wanton or reckless manner" and thus they are entitled to statutory immunity from Ohio tort claims. *See Burghardt v. Ryan*, 560 F.Supp.3d at 1112-13; *see also Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 404 (6th Cir. 2015) ("If the officers were objectively reasonable in shooting [plaintiff], it logically follows that they could not have been reckless in shooting [plaintiff]"); *Mullins*, 805 F.3d at 769 ("Because we find that [the officer's] use of deadly force was not objectively unreasonable under the circumstances, it follows that he did not act with 'malicious purpose, in bad faith, or in a wanton or reckless manner,' as required to avoid statutory immunity under Ohio law.") (quoting Ohio Rev. Code § 2744.03(A)(6)(b)). Consequently, I conclude the Officers are immune from Mr. Dale's Ohio tort claims pursuant to § 2744.03.

In sum, I conclude that qualified immunity and statutory immunity shield the Officers from Mr. Dale's first, third, and fourth claims. Thus, the Officers are entitled to summary judgment in their favor on each claim.

II. **The City is entitled to summary judgment because there was no underlying constitutional violation that would support a theory of *Monell* liability.**

Mr. Dale's second claim for relief against the City arises under *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658 (1978). (ECF #1 at PageID 7). The City seeks summary judgment in its favor on this claim, arguing it cannot be vicariously liable for the actions of the Officers and Mr. Dale has failed to advance facts that support any theory of liability under *Monell*. (ECF #31 at PageID 418-26). Mr. Dale did not respond to the City's motion for summary judgment, either in a stand-alone filing or in connection with responding to the Officers' motion.[3] As such, the City's motion is unopposed.

But a district court may not grant summary judgment "solely because the non-moving party has failed to respond to the motion." *Miller v. Shore Fin. Servs., Inc.*, 141 F.App'x 417, 419 (6th Cir. 2002). If the nonmovant has failed to respond, summary judgment cannot be granted unless the court finds that "the motion and supporting materials–including the facts considered undisputed– show that the movant is entitled to relief." Fed. R. Civ. P. 56(e)(3). In so doing, I must review carefully the portions of the record the moving party submitted to determine whether a genuine dispute of material fact exists. *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014).

Under *Monell* and its progeny, a plaintiff may hold a municipality liable for a constitutional injury inflicted by a "policy, or custom" of the municipality itself. *Monell*, 436 U.S. at 694; *Stucker v. Louisville Metro Gov't*, No. 23-5214, 2024 WL 2135407, at *5 (6th Cir. May 13, 2024). There are four types of municipal action that, if they cause the underlying constitutional violation, produce *Monell* liability: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of

---

[3] Mr. Dale requested and was granted two separate one-week extensions of the time limit to respond to the City's motion. (*See* non-document entries of May 28 and June 21, 2024).

19

inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019).

Because the Officers are entitled to qualified immunity as detailed above, Mr. Dale's *Monell* claim against the City necessarily fails. *See Savage v. City of Memphis*, 620 F.App'x 425, 429 (6th Cir. 2015) ("There can be no liability under *Monell* without an underlying constitutional violation.") (quoting *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)). Consequently, the City is entitled to summary judgment in its favor on Mr. Dale's *Monell* claim.

## CONCLUSION

Having determined that Officers Turner and Nitkiewicz are each entitled to qualified immunity from Mr. Dale's first claim for relief and statutory immunity from his third and fourth claims for relief, I **GRANT** the Officers' joint motion for summary judgment in their favor on all claims against them. Further, because the Officers did not violate Mr. Dale's constitutional rights, there is no viable *Monell* claim against the City of Oregon; therefore, I **GRANT** the City's motion for summary judgment in its favor. Having disposed of all claims against all defendants, I order this case **DISMISSED**.

IT IS SO ORDERED

Dated: September 11, 2024

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE